UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEROME MARKIEL DAVIS, Plaintiff, v. CARLOS BOLANOS, et al., Defendants. | Case No. 19-cv-01605-SI<br><br>**ORDER OF DISMISSAL WITH LEAVE TO AMEND**<br><br>Re: Dkt. No. 1 |

Jerome Markiel Davis, an inmate currently housed at San Quentin State Prison, filed this *pro se* prisoner's civil rights action under 42 U.S.C. § 1983. His complaint is now before the court for review pursuant to 28 U.S.C. § 1915A.

## BACKGROUND

Davis claims that officials at the Maguire Correctional Facility in Redwood City knowingly served him food that had been tampered with and failed to properly process his grievances and mail about the food tampering.[1] He never saw any of the food tampering, and instead believes it

---

[1] This is not the first time Davis has complained of people tampering with his food in an effort to harm him. In *Davis v. California*, E.D. Cal. Case No. 18-cv-832 BAM, Davis complained of food tampering at Corcoran State Prison and Deuel Vocational Institution, and alleged that he was given meals that made his mouth bleed and go numb with a medicinal taste. In his complaint in *Davis v. Seihel*, E. D. Cal. Case No. 18-cv-1261 EFB, Davis alleged that the Mexican Mafia had a contracted hit on him, that a "Blood gang member" threatened attacks, and that food tampering at Deuel Vocational Institution caused his mouth to bleed and his stomach to hurt. The court takes judicial notice of the files in these cases in the U.S. District Court for the Eastern District of California. *See* Fed. R. Evid. 201(b). The court does not judicially notice that the allegations in those two cases were true, but merely that those allegations were made in documents filed in court by Davis. In addition to the recurring theme in these three civil cases (i.e., this case and the two Eastern District cases) that people are out to harm Davis, there also was evidence in Davis' criminal case that Davis thought people were out to get him. Davis' girlfriend told police that Davis shot at a man Davis thought was out to get him (although Davis denied it at trial), and the trial court at

happened based on symptoms he experienced after eating on several occasions.

The complaint alleges the following:

The events occurred at the Maguire Correctional Facility in August - February 2019, where Davis was housed for a trial. At the time, Davis was a convicted prisoner of the State of California and had been transferred to the jail on July 11, 2018, for a state trial. Docket No. 1 at 5, 12.

Upon his arrival at the jail, Davis told correctional officer (C/O) Sharma that there was a "contracted hit on him by the Nortenos," who knew of his arrival. *Id.* at 5-6. Sharma moved Davis to administrative segregation, away from the general population. *Id.* at 6. However, general population inmates, including Nortenos, worked in the kitchen. Sharma did not prevent the Nortenos from continuing to work in the kitchen; "as a result, [Davis'] meals were tampered with." *Id.* at 6. The Nortenos could figure out which meal was Davis' meal because his meals were labeled with his name due to his participation in a kosher diet plan. *See id.* "At times [Davis] would find long pieces of plastic in his milk carton, upside down crosses-(anti-Christ) carved into his apples, bleeding from the mouth after eating, stomach pains, dizziness, and chest pains." *Id.* The milk cartons that allegedly had large pieces of plastic inside were sealed milk cartons. *Id.* at 12.

Sheriff Bolanos, undersheriff Robinson, and lieutenant Reynolds were made aware of but did not investigate Davis' claims of food tampering or take precautionary steps to prevent the food tampering from happening again. *Id.* at 6-8. (Although Davis alleges that no investigation was done, he also alleges that Reynolds interviewed him, determined that Davis had no proof of his allegations, and sent a notice of the investigation informing Bolanos and Robbins that Davis' "allegations of food tampering, conspiracy, and corruption were unfounded." *Id.* at 7, 11. Those allegations describe an investigation, even if it was not an elaborate one.) Bolanos and Robbins are liable as supervisors because they did not require that food be under constant watch to avoid tampering. *Id.* at 8. They let civilian staff oversee the inmates making the food but neither staff nor food handlers had body cameras to capture all activity, and no cameras were in place to capture the

---

sentencing observed that "there's a mental health aspect to the crimes that has not been addressed." *People v. Davis*, No. C084396, 2018 WL 4658753 (Cal. Ct. App. Sept. 28, 2018).

activity in transporting the food between facilities. *Id.* at 8-9. The food tampering takes place in the "known blind spots, which then creates a conspiracy." *Id.* at 9. Sheriff Bolanos and Undersheriff Robbins failed to adequately train and supervise the employees that work in the kitchen, although the need for such training and supervision "was obvious after plaintiff's numerous allegations of food tampering" and the injuries to plaintiff caused by the food tampering. *Id* at 10. Reynolds defamed Davis by telling him that he lacked proof of his allegations and that he was lying, and then sending a notice of his investigation to Bolanos and Robbins. *Id.* at 11.

C/O Hedgecock assisted in serving a meal to Davis on October 13, 2018, after which Davis experienced symptoms and called for medical help. Hedgecock called the mental health department instead of the medical department for help, and told the mental health staff that Davis made false claims of food tampering. *Id.* at 12. "An inmate who assisted in serving [Davis'] food overheard [Davis'] plea for help on the intercom; then came over to [his] cell, and said,- 'you feel dizzy, because me, and my homies do big hits.'" *Id.* at 12 (brackets added; punctuation in source). To Davis, this meant that the Norteno inmate and "his homies know of the contracted hit" on Davis and were "attacking" his food. *Id.* Davis contends that Hedgecock knew the food was being tampered with because food tampering had occurred in August in the same jail dorm, a classification card stated why Davis was in administrative segregation, and Hedgecock also knew the food was tampered with because Hedgecock heard the inmate state that the inmate and his "'homies do big hits'" yet "acted like he did not hear." *Id.* at 13. (The inmate's statement was, however, made after the food had been served and after Davis sought medical help, which undermines the notion that it shows that Hedgecock earlier knew he was serving food that had been tampered with.) Davis claims that Hedgecock is liable for an Eighth Amendment violation, an equal protection violation, retaliation, interference with religious freedom, intentional assault, and defamation.

Later that day (October 13), Davis wrote a grievance about food tampering. Hedgecock took the grievance from the mail and ripped it up. *Id.* at 20-22. (Contradicting himself, Davis states that he included that grievance in a habeas petition he mailed on October 14. *Id.* at 25.)

On October 14, 2018, Davis wrote a grievance about the food tampering and Hedgecock's destruction of his grievance. He gave the grievance to Ramirez to process, but Ramirez never turned

3

it in to be processed and Davis never received a response. *Id.* at 24. (Contradicting himself, Davis states that he included that grievance in a petition he mailed later on October 14. *Id.* at 25.)

Also on October 14, 2018, Davis prepared a petition for writ of habeas corpus to send to the California Supreme Court about the October 13-14 incidents. *Id.* He handed to C/O Sharma a sealed envelope containing the petition as well as the grievances that were written on the incidents involving Hedgecock (which, contradictorily, Davis alleged had been destroyed or confiscated by Hedgecock and Ramirez). *Compare id.* at 25 *with id.* at 22, 24. Later that night, Sharma went downstairs, pulled the legal mail, and put white-out all over the grievance written on Hedgecock and signed by Ramirez on October 14. *Id.* at 25. When Davis received a copy of his petition from the court, the grievance was unreadable. *Id.* Davis contends that Sharma's conduct amounted to a due process violation, mail tampering, mail fraud, and cruel and unusual punishment. *Id.* at 25-28. Davis does not allege any facts showing his allegations of misconduct by Ramirez to be anything more than speculation, as he does not allege that Ramirez did anything wrong in Davis' presence.

On October 21, 2018, Davis wrote a complaint to sheriff Bolanos and gave it to C/O Maier. Later that day, Maier went to the mail bag, pulled out Davis' letter, and marked it "return to sender." *Id.* at 29. Davis received the letter outside the envelope on November 10, 2018, with no correspondence from the recipient. Davis contends this amounted to mail theft, mail tampering, and a due process violation by officer Maier. Davis does not allege any facts showing his allegations of misconduct by Maier to be anything more than speculation, as he does not allege that Maier did anything wrong in Davis' presence.

Sergeant Zuno spoke to Davis on an unstated date concerning Davis' grievances and told Davis that he would investigate. Zuno did not investigate however. Davis contends that, because there was no investigation, his food was tampered with on February 23 and 25. *Id.* at 32-33.

On November 13, 2018, Davis re-sent the October 21 letter to sheriff Bolanos. C/O Costa pulled the letter from the mail and discarded it. *Id.* at 34. This amounted to mail theft and a due process violation. Davis does not allege any facts showing his allegations of misconduct by Costa to be anything more than speculation, as he does not allege that Costa did anything wrong in Davis' presence.

Davis contends that all three of his meals were tampered with on February 23, 2019. C/Os Eleba and Andreatta gave him a tray for breakfast that was not a kosher breakfast. When he asked for the tray with his name on it, they told him that his meal was not there and he could take the regular tray. *Id.* at 36. After Davis ate, his mouth began to itch and bleed. Later, Davis received a kosher lunch from C/O Bernacil, after which his mouth began to itch and bleed. After Davis ate the kosher dinner he received from C/O Tippins, his mouth began to itch and bleed once again. Davis asked deputy Cody to call for medical help and showed him blood that he (Davis) spat into the sink. Cody did not call for medical assistance and refused to take a picture of the blood. Davis does not allege that any harm befell him as result of medical staff not seeing him that day. He conclusorily alleges that defendants Eleba, Andreatta, Bernacil, and Tippins knew the food was tampered with when they served it. *Id.* at 36-38.

On February 25, 2019, C/O Conneally handed Davis another inmate's lunch and gave that inmate Davis' lunch. Conneally knew that the other inmate was Davis' enemy. Upon Davis' request, Conneally switched the lunches, i.e., Conneally retrieved Davis' lunch tray from the other inmate's cell and gave the other inmate the lunch that had wrongly been delivered to Davis. When Davis opened his lunch bag (which had his name on it), the bread was wet with a sour smell, even though the bread normally would be dry and in a plastic bag. Conneally refused to provide a replacement lunch for Davis. In perhaps the most improbable of his theories, Davis contends that Conneally specifically gave Davis' lunch to the enemy-inmate so that Davis' enemy could tamper with it, knowing that Davis would ask for his lunch to be returned to him and thereby receive a tampered-with lunch. *Id.* at 42.

The interference with Davis' mail on October 14, October 21, and November 13 by Hedgecock, Sharma, Ramirez, Maier, and Costa was done in retaliation "because they did not want [Davis] to be able to speak about" the food tampering. *Id.* at 46. The interference with his mail also violated Davis' right to equal protection because other inmates were not treated this way. *Id.* at 48. The service of contaminated food on February 23 and 25 was retaliation against Davis because he is "on a kosher diet, and is a Jew," *id.* at 47, and violated Davis' right to equal protection because other inmates were not treated this way, *id.* at 49.

5

On March 12, 2019, C/O Elabed served Davis a kosher breakfast. After eating the breakfast, Davis' mouth began to itch and bleed. Davis asked for medical help and C/O Higgins saw the blood that Davis had spit in the sink. Medical staff came by hours later, after the bleeding had stopped. Elabed participated in food tampering and "participated in the conspiracy to kill [Davis] that the staff in this jail are all in on." *Id.* at 50.

Davis contends that all of the defendants are engaged in a "collusion conspiracy" to tamper with his meals and not send out his mail when he attempts to file grievances. *Id.* at 51. "[D]efendants are conspiring to kill [Davis] along with the inmates that they let tamper with his food." *Id.*

**DISCUSSION**

A federal court must engage in a preliminary screening of any case in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity. See 28 U.S.C. § 1915A(a). The court must identify any cognizable claims, and dismiss any claims which are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. *See id*. at § 1915A(b)(1),(2). *Pro se* complaints must be liberally construed. *See Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

Although a complaint "does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). A complaint must proffer "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

6

The complaint fails to state a claim for relief that is plausible on its face. As there are many theories of relief, the court will go through the complaint theory-by-theory instead of defendant-by-defendant. The court will describe the deficiencies and grant leave to amend so that Davis may file an amended complaint that cures the deficiencies.

Eighth Amendment – food tampering: The Eighth Amendment imposes duties on prison officials to provide prisoners with the basic necessities of life, such as food, clothing, shelter, sanitation, medical care, and personal safety. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A plaintiff alleging that conditions of confinement amount to cruel and unusual punishment prohibited by the Eighth Amendment must satisfy a two-prong test. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). First, a plaintiff must satisfy an objective test showing that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Allegations that an inmate has been provided contaminated food may be sufficient to satisfy the objective prong of an Eighth Amendment claim. *See Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996) (spoiled food and foul water are inadequate to maintain health); *but see LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993) ("'The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation.'"). Second, the plaintiff must show that the prison official inflicted the deprivation with a "sufficiently culpable state of mind," that is, with "deliberate indifference" to the prisoner's health or safety. *Farmer*, 511 U.S. at 834. The deliberate indifference standard requires that the official know of and disregard an excessive risk to prisoner health or safety. *See id.* at 837.

The complaint's allegations of food tampering do not contain enough facts to state a claim to relief that is plausible on its face. Davis believes his food was tampered with based on symptoms he allegedly experienced after eating the food, even though he concededly never saw anyone tampering with his food. The only food item that he alleges showed any signs of tampering were the milk cartons – which allegedly contained large pieces of plastic – but he alleges that those milk cartons were sealed, and offers no suggestion how the plastic could have been put in those sealed cartons. The complaint also does not allege that any medical care provider has ever confirmed food tampering, nor does it allege any long-term ill effects for Davis. The symptoms Davis alleges (i.e.,

7

bleeding from mouth, itchiness, stomach pain) are as consistent with gum disease and food intolerance as with food tampering. And Davis has in the past claimed that persons tampered with his food at two other prisons based on similar symptoms. In those two other cases (*see* footnote 1), the food tampering allegedly was done by one or two competing gangs who also allegedly had a contract to kill him (i.e., it was the Mexican Mafia and perhaps the Bloods in the prisons, while it was the Nortenos at the Maguire Correctional Facility). Given all these circumstances, a claim of deliberate indifference to inmate health/safety based on food tampering does not state a claim to relief that is plausible on its face. Moreover, the complaint does not contain nonconclusory allegations showing that any of the defendants acted with the requisite mental state of deliberate indifference to Davis' health or safety in serving him his meals.

Eighth Amendment – medical care: Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's prohibition of cruel and unusual punishment. *See Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim based on inadequate medical care, a prisoner-plaintiff must show: (1) a serious medical need, and (2) deliberate indifference thereto by a defendant. Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

The complaint does not allege sufficient facts to state a plausible claim for deliberate indifference to Davis' serious medical needs by any defendant. He has not alleged facts showing the existence of a serious medical need. His allegations suggest that the bleeding from his mouth stopped before medical staff even arrived, suggesting it was minimal bleeding. He needs to be more detailed in his amended complaint in his description of the bleeding so that the reader can see whether he means a trace amount of blood or substantial amounts of blood. His alleged itchiness does not appear to be a serious medical need. And he has not sufficiently described his stomach ache to allow a reasonable inference that it was anything more than routine gastrointestinal upset after eating that does not warrant medical intervention. With regard to his allegations that

Hedgecock violated the Eighth Amendment by contacting mental health care providers instead of the medical care providers Davis wanted, the allegations are insufficient to state a claim both because Davis has not identified a serious medical need and does not allege facts showing that the mental health care providers were unable to address his ailments. Although mental health care providers may emphasize mental health care, there is no allegation that they lacked medical training such that treating a physical ailment was beyond their ken.

Conspiracy: Conclusory allegations of a conspiracy unsupported by material facts are insufficient to state a claim. *See Simmons v. Sacramento County Superior Court*, 318 F.3d 1156, 1161 (9th Cir. 2003); *Woodrum v. Woodward County*, 866 F.2d 1121, 1126 (9th Cir. 1989). "'A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage.'" *See Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (citation omitted). A civil plaintiff "must show that the conspiring parties reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Id.* (internal citation and quotation marks omitted). A conspiracy is not itself a constitutional tort under 42 U.S.C. § 1983, but may "enlarge the pool of responsible defendants by demonstrating their causal connections to the violation." *Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc). The complaint's numerous conspiracy allegations do not aid Davis because they are mere conclusions unsupported by any facts.

Retaliation: Within the prison or jail context, "a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). The complaint fails to state a cognizable retaliation claim because Davis does not make plausible allegations that adverse actions were taken by particular defendants because of his exercise of his First Amendment rights.

Equal protection: "To state a § 1983 claim for violation of the Equal Protection Clause a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005) (citation and internal quotation marks omitted). Even with liberal construction, the complaint does not state a claim for a violation of Davis' right to equal protection because no *facts* are alleged to suggest that any defendant acted with a discriminatory purpose and that such a defendant's actions had a discriminatory effect.

Due process: Davis repeatedly uses the phrase "due process" in his complaint but does not elaborate on the theory. Because the Eighth Amendment provides the constitutional protection against cruel and unusual punishment and the First Amendment provides the constitutional protections of speech and religion, Davis cannot rely on the more generalized notion of "substantive due process" to obtain relief for the alleged food tampering and inadequate medical care, or for the alleged interference with his speech, mail and religion. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims'"). Because a substantive due process theory cannot be pursued, that leaves only the possibility of a procedural due process claim, which does not appear to apply in the present situation but which will be described in the event Davis has more facts to allege.

The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution protects individuals against governmental deprivations of life, liberty or property without due process of law. Interests that are procedurally protected by the Due Process Clause may arise from two sources: the Due Process Clause itself and laws of the states. *See Meachum v. Fano*, 427 U.S. 215, 223-27 (1976). In the prison context, these interests are generally ones pertaining to liberty. Changes in conditions so severe as to affect the sentence imposed in an unexpected manner implicate the Due Process Clause itself, whether or not they are authorized by state law. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citing *Vitek v. Jones*, 445 U.S. 480, 493 (1980) (transfer to mental hospital), and *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (involuntary administration of

psychotropic drugs)). Deprivations that are less severe or more closely related to the expected terms of confinement may also amount to deprivations of a procedurally protected liberty interest, provided that the liberty in question is one of "real substance." *See Sandin*, 515 U.S. at 477-87. An interest of "real substance" will generally be limited to freedom from restraint that imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" or "will inevitably affect the duration of [a] sentence." *Id.* at 484, 487. In addition to showing a deprivation of a liberty interest of real substance, a plaintiff must also show that sufficient procedural protections were not provided in connection with that deprivation to state a due process claim. Here, the complaint fails to allege facts showing the deprivation of a liberty interest of real substance and fails to identify the procedural protections that should have been but were not provided before that deprivation.

Appeals and letters: There is no federal constitutional right to a prison administrative appeal or grievance system for California inmates. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003). Prison officials are not liable for a due process violation for simply failing to process an appeal properly, denying an inmate appeal or granting an inmate appeal. A claim under § 1983 for a due process violation is not stated against any defendant for a denial of plaintiff's inmate appeals. The due process claims against defendants for mishandling (including failing to adequately investigate) or denying Davis' inmate appeals and letter requests are dismissed without leave to amend.

Interference with mail: Prisoners enjoy a First Amendment right to send and receive mail. *See Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995). The problem with Davis' allegations regarding his mail is that they are self-contradictory. He alleges, for example, that Hedgecock destroyed a grievance on October 13, but also that he (Davis) included that grievance with the habeas petition he filed the next day. He does not explain how he was able to mail a grievance that had been destroyed the preceding day. Likewise, he alleges that Ramirez confiscated a grievance on October 14, but also that he (Davis) included that grievance with the habeas petition he filed later that day. He does not explain how he was able to mail this grievance that earlier had been confiscated. He also has alleged insufficient facts to support a plausible claim against C/O Maier

11

1  or C/O Costa, as his allegations appear to be nothing more than speculation that they interfered with
2  the mail outside of his (Davis') presence.

Interference with religion: The First Amendment guarantees the right to the free exercise of religion. In order to establish a free exercise violation, a prisoner must show a defendant burdened the practice of his religion without any justification reasonably related to legitimate penological interests. *See Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008). Inmates' religious freedoms also are protected by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1. RLUIPA provides: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 [which includes state prisons, state psychiatric hospitals, and local jails], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). The complaint fails to state a claim for violation of Davis' religious freedom rights because the alleged interference with his religion is that he was served contaminated food but the allegations that he was served food that had been tampered with are implausible for the reasons stated earlier. Additionally, he has not alleged facts plausibly suggesting that the food served to him was inconsistent with his need for a kosher diet.

Defamation: Defamation alone is not a constitutional violation, even when done under color of state law. *See Paul v. Davis*, 424 U.S. 693, 701-710 (1976). Reputation is not a liberty or property interest protected by the Due Process Clause unless it is accompanied by "some more tangible interests." *Id.* at 701. "[A]lteration or extinguishment of 'a right or status previously recognized by state law,'" *Humphries v. County of Los Angeles*, 554 F.3d 1170, 1185 (9th Cir. 2009), *overruled on other grounds*, 562 U.S. 29 (2010), (quoting *Paul v. Davis*, 424 U.S. at 711), or violation of a right specifically secured by the Bill of Rights, *Cooper v. Dupnik*, 924 F.2d 1520, 1532 n.22 (9th Cir. 1991), constitute deprivation of such "tangible" interests. This has become known as the "stigma-plus" test. *Humphries*, 554 F.3d at 1185. There are several ways to meet the "stigma-plus" test, e.g., alleging that the injury to reputation caused the denial of a federally protected right, or

12

alleging that the injury to reputation was inflicted in connection with a federally protected right, or alleging that the challenged action "creates both a stigma and a tangible burden on an individual's ability to obtain a right or status recognized by state law." *Humphries*, 554 F.3d at 1188; *Cooper*, 924 F.2d at 1532. The stigma-plus test cannot be met by alleging collateral consequences of the defamation, such as loss of business, public scorn and potential loss of employment, *see Cooper*, 924 F.2d at 1534.

Here, the complaint alleges that defendants defamed Davis by determining that his allegations of food tampering were unfounded. The complaint does not state a § 1983 defamation claim because it does include allegations to satisfy the "stigma" or the "plus" parts of the stigma-plus test. That is, the complaint does not allege that the allegedly defamatory statements injured plaintiff's reputation and does not allege that the injury to reputation caused the denial of a federally protected right, or was inflicted in connection with a federally protected right, or created both a stigma and a tangible burden on Davis' ability to obtain a right or status recognized by state law. He is cautioned that he cannot merely allege there was a property or liberty interest – he has to identify what that the property or liberty interest was.

Supervisors' liability: In § 1983 cases the traditional doctrine of *respondeat superior* does not apply. *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018). Instead, the plaintiff must allege facts showing that the supervisor was either (1) personally involved in the constitutional violation or (2) sufficiently causally connected to the constitutional violation through the supervisor's own wrongdoing. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). There are two ways to show that a sufficient causal connection existed: (1) by showing that the supervisor set in motion a series of acts by others that culminated in the constitutional violation or (2) by showing that the supervisor knowingly refused to terminate the acts by others, which the supervisor knew or reasonably should have known would result in a constitutional violation. *Id*. at 1207-08. The result is that the supervisor is not vicariously liable for the actions of her subordinates; instead, the supervisor can be personally liable for her own action or inaction in the "training, supervision, or control of [her] subordinates" or for her "reckless or callous indifference to the rights of others." *Rodriguez v. County of L.A.*, 891 F.3d 776, 798 (9th Cir. 2018) (quoting *Keates v. Koile*, 883 F.3d

13

1228, 1242-43 (9th Cir. 2018)). The allegations of the complaint do not state a plausible claim for supervisory liability against Sheriff Bolanos or Undersheriff Robbins based on their alleged failure to require body cameras for all food handlers/transporters. Although Davis posits that body cameras would avoid food tampering, he does not allege facts plausibly suggesting that the Sheriff and Undersheriff knew or reasonably knew of food tampering, let alone food tampering that would be stopped by the use of body cameras on all persons who handled food or transported food at the jail. Similarly, the complaint's allegations that these defendants are liable due to inadequate supervision fails to state a claim against them because the allegations of food tampering are implausible for the reasons explained earlier and because the complaint does not plausibly allege facts suggesting that the Sheriff or Undersheriff knew or reasonably knew of food tampering that would be stopped by additional supervision, given that the food-preparing inmates allegedly already were under supervision by civilian staff.

Leave to amend is granted so that Davis may file an amended complaint in which he attempts to cure the numerous deficiencies that have been discussed in this order. In his amended complaint, Davis should not refer to the defendants as a group (e.g., "the defendants"); rather, he should identify each involved defendant by name and link each of them to each of his claims by explaining what each defendant did or failed to do that caused a violation of his constitutional rights. *See Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988) (damages liability may be imposed on individual defendant under § 1983 only if plaintiff can show that defendant proximately caused deprivation of federally protected right).

**CONCLUSION**

The complaint is dismissed with leave to amend. Davis must file an amended complaint no later than **October 28, 2019**, and must include the caption and civil case number used in this order as well as the words AMENDED COMPLAINT on the first page. Davis is cautioned that his amended complaint must be a complete statement of his claims, except that he does not need to allege any claim that has been dismissed without leave to amend. *See Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc). Failure to file an amended complaint by the deadline

14

will result in the dismissal of the action.

**IT IS SO ORDERED**.

Dated: September 17, 2019

_____
SUSAN ILLSTON
United States District Judge